SACILOR, ACIERIES ET LAMINOIRS de LORRAINE and Bergrohr-Herne and Vallourec, Appellants,

v.

UNITED STATES of America, Malcolm Baldridge, Secretary of Commerce, and the United States Department of Commerce, Appellees.

Appeal No. 85–2706.

United States Court of Appeals, Federal Circuit.

March 31, 1987.

Pierre F. deRavel d'Esclapon, Donovan Leisure Newton & Irvine, New York City, argued for appellants. With him on the brief was Melvin S. Schwechter. Also on the brief were Professor Myres S. McDougal and Professor Michael Reisman, New Haven, Conn., of counsel.

Velta A. Melnbrencis, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued, for appellees. With her on the brief were Richard K. Willard, Asst. Atty. Gen. and David M. Cohen, Director. Also on the brief were Douglas A. Riggs, General Counsel, M. Jean Anderson, Chief Counsel for Intern. Trade and Robert F. Seely, Atty.-Advisor, Office of the Deputy Chief Counsel for Import Admin., U.S. Dept. of Commerce, of counsel.

Eugene L. Stewart, Terence P. Stewart, Charles A. St. Charles and Ronald M. Wista, of Stewart & Stewart, Washington, D.C., were on the brief, for amicus curiae Bethlehem Steel Corp. Also on the brief were Curtis H. Barnette, General Counsel and Laird D. Patterson, Counsel, Bethlehem Steel Corp., Bethlehem, Pa.

Before RICH, BISSELL and ARCHER, Circuit Judges.

BISSELL, Circuit Judge.

This appeal is from the order of the Court of International Trade, 613 F.Supp. 364 (Ct. Int'l Trade 1985), dismissing the

cases of plaintiffs-appellants Sacilor, Acieries et Laminoirs de Lorraine; Bergrohr-Herne; and Vallourec (collectively Sacilor) for failure to state a cause of action under the substantive law and for unavailability of judicial review under the Administrative Procedure Act (APA). We vacate and remand for the trial court to dismiss the cases for lack of jurisdiction.

## BACKGROUND

Appellants are three European producers of steel pipe who contracted with the All-American Pipeline Company (AAPL) in September 1984 to supply 320,000 tons of a particular steel pipe for the "California-Texas Pipeline" built by AAPL. The export of steel pipe from Europe to the United States is governed by the Steel Import Stabilization Act (SISA), Title VIII of the Trade and Tariff Act of 1984, Pub.L. No. 98–573, 98 Stat. 2998, enacted October 30, 1984, subsequent to Sacilor's contracting with AAPL. The SISA, 19 U.S.C. § 2253, *inter alia,* authorizes the Secretary of Commerce to ensure that export of pipe and tube by the European Economic Community (EEC) does not exceed levels agreed to between the United States and the EEC as set forth in the Arrangement on European Communities' Export of Pipes and Tubes to the United States of America (Arrangement). Both the initial Arrangement and all modifications and clarifications control the export of pipes and tubes to the United States.

By an exchange of letters on October 21, 1982, the United States and the EEC initially agreed that the EEC would establish measures to ensure that the annual export of pipes and tubes to the United States would not exceed the 1979–80 average share of annual United States apparent consumption. *See* United States-European Communities Steel Pipe and Tube Imports Agreement: Hearings before the Subcommittee on International Trade of the Senate Finance Committee, 98th Cong., 1st Sess. 58 (1983). On January 10, 1985, another exchange of letters between the United States and EEC clarified the October 21, 1982 Arrangement.

As clarified, the Arrangement provides in article 1 that the EEC shall restrain exports of steel pipes or tubes to a level of 7.6 percent (10 percent of "oil country tubular goods" per article 2) of United States apparent consumption for the calendar years 1985 and 1986. The EEC agreed to issue export licenses as the mechanism of restraint and published the pertinent regulations in 28 O.J.Eur.Comm. (No. L. 9) 13–31 (1985).

Both the SISA and the Arrangement provide for the export of additional steel pipes and tubes over the agreed levels if the Secretary of Commerce determines that a "short supply" or "emergency market situation" exists in the United States. The Arrangement establishes in article 8 that the EEC may request such a determination. Article 8 also provides that, once the Secretary does conclude a short supply exists, the United States must allow importation of the additional steel pipes and tubes.

Pursuant to article 8, on January 21, 1985, the EEC submitted a request for a short supply exemption, specifically for the AAPL project. The Secretary of Commerce examined the request, solicited comments (50 Fed.Reg. 4719–20 (1985)), sent questionnaires to potential United States producers, and met with officials of AAPL, which wished to import the pipe. On March 28, 1985, the Secretary denied the short supply exemption and so informed the EEC and AAPL by letter, explaining that he had determined that three United States producers, with combined unused capacity for the product of about one million tons, could meet AAPL's needs.

On May 13, 1985, Sacilor commenced suit in the trial court, claiming that the Secretary's determination was arbitrary, capricious, and a denial of its due process rights. On June 18, 1985, the United States agreed to admit 100,000 tons of pipe for the AAPL project in addition to the levels of imports permitted under the Arrangement. After this appeal was filed, the parties informed the court that the contract between Sacilor and AAPL contains a *force majeur* clause which "insulates appellants from liability to the Buyer for non-delivery." Appellants'

Supp. Brief at 2. The parties also informed the court that AAPL has received from domestic and foreign producers "all the line pipe required for the AAPL project." Appellees' Supp. Brief at 6.

### The Trial Court's Decision

After predicating jurisdiction on 28 U.S.C. § 1581(i)(4) in relation to 28 U.S.C. § 1581(i)(3),* the trial court determined that neither section 805 of the SISA nor the Arrangement established direct, affirmative, and judicially enforceable rights for private parties in Sacilor's position. The SISA's legislative history demonstrates, the court said, that the short supply provision was "designed to protect domestic producers of steel products...." H.R.Rep. No. 1156, 98th Cong.2d Sess. 200, *reprinted in* 1984 U.S.Code Cong. & Admin.News 4910, 5220, 5317. The terms of the Arrangement indicate that it binds only the signatory parties—the United States and the EEC.

As to judicial review, the trial court stated that 28 U.S.C. § 2631(i) permits parties to commence actions in the Court of International Trade, once jurisdiction is established, if they are adversely affected or aggrieved within the meaning of the APA. The trial court found the requisite "injury in fact" in Sacilor's alleged economic injury resulting from the SISA's restrictions and the requisite interest within the "zone of interest" in the partial exclusion of Sacilor's product from importation because of the SISA and the agreements permitted by the SISA.

The trial court, however, declined to review the Secretary's decision, finding that decision to be an agency action committed by law to the agency's discretion under 5 U.S.C. § 701(a)(2). The trial court determined that, because the decision on lack of

a short supply was *part of the foreign affairs process,* the type of review sought by Sacilor would necessarily involve an "impermissible intrusion into a discretionary decision-making process." The trial court concluded that it was inappropriate to review the Secretary's determination and held, therefore, that it was not subject to judicial review.

Finally, as to Sacilor's due process claim, the trial court determined that because (1) neither the SISA nor the Arrangement provided a private right of action and (2) there is no generally available protectable interest to engage in foreign trade, the lack of a hearing on the short supply determination was not a violation of due process.

### OPINION

In our view, the trial court lacked jurisdiction over these cases because, as the United States asserts, Sacilor lacks standing to raise the claims, and because Sacilor's claims are moot.

■ Sacilor lacks standing to challenge the Secretary's determination. The Supreme Court's recent cases have recognized that the standing doctrine has both constitutional and prudential aspects. *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). As with the related doctrine of mootness, the constitutional aspect of standing is grounded in the Article III requirement of a case or controversy. U.S. Const. art. III, § 2. To satisfy this aspect of the standing doctrine, the plaintiff must not only have experienced some concrete injury-in-fact, but "[t]he injury must be 'fairly' traceable to the challenged action, and relief from the injury must be 'likely' to follow from a favorable decision." *Allen v. Wright,* 468

---

* Section 1581(i) provides, in pertinent part:

(i) In addition to the jurisdiction conferred upon the Court of International Trade by subsections (a)–(h) of this section and subject to the exception set forth in subsection (j) of this section, the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for—

. . . .

(3) embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety; or

(4) administration and enforcement with respect to the matters referred to in paragraphs (1)–(3) of this subsection and subsections (a)–(h) of this section.

U.S. at 751, 104 S.Ct. at 3324 (quoting *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976)). Assuming that Sacilor has sustained the required injury-in-fact, as a result of the Secretary's determination, it is not clear that relief would be likely to follow from a favorable decision in this case. AAPL is no longer obligated to purchase Sacilor's pipe. Even if such an obligation existed, export of the pipe would be contingent on receipt from the EEC of the necessary export licenses. There is nothing in the record before us indicating that the EEC would issue the licenses to Sacilor.

The prudential aspect of the standing doctrine is no less troublesome. In the administrative context, this aspect of the doctrine is derived from the requirement of section 702 of the APA that a plaintiff challenging agency action must be "adversely affected or aggrieved." 5 U.S.C. § 702 (1982). The question turns on whether " 'the interest sought to be protected by the complainant [is] arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.' " *Clarke v. Securities Indus. Assn.*, — U.S. —, 107 S.Ct. 750, 755, 93 L.Ed.2d 757 (1987) (quoting *Association of Data Processing Serv. Org. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970)). In applying this "zone of interest" test, the Court stated: "The essential inquiry is whether Congress 'intended for [a particular] class [of plaintiffs] to be relied upon to challenge agency disregard of the law." *Id.* 107 S.Ct. at 757 (quoting *Block v. Community Nutrition Inst.*, 467 U.S. 340, 347, 104 S.Ct. 2450, 2454, 81 L.Ed.2d 270 (1984)).

Although Sacilor's interests are arguably regulated by section 805(b)(3) of the SISA, it does not appear that Congress intended to rely on foreign manufacturers to challenge administrative application of American import laws. As the trial court correctly observed, the legislative intent behind section 805(b)(3) was to protect domestic purchasers of steel products. H.R.Rep. No. 1156, 98th Cong.2d Sess. 200, *reprinted in* 1984 U.S.Code Cong. & Admin.News 5220, 5317. Clearly AAPL would have had standing to challenge the Secretary's determination, but it would be contrary to the entire purpose of the Act to allow foreign producers to challenge a decision made pursuant to a regulatory scheme designed to protect American steel producers from foreign imports. SISA § 802.

■ Alternatively, Sacilor's claims are moot. When Sacilor brought its action before the trial court, it sought a judicial reversal of the Secretary's determination that certain pipe was not in short supply. Sacilor had a contract to sell such pipe to AAPL and presumably would have delivered the pipe if it could have obtained the required EEC export licenses and if the Secretary had found the pipe to be in short supply. Sacilor and AAPL were released from their obligations under the contract by virtue of the contract's *force majeur* provision. After the suit was filed, AAPL obtained elsewhere the pipe it needed to complete the pipeline. Sacilor does not dispute this fact.

The goal of the suit was to allow Sacilor to export pipe to the United States to fulfill its obligation to AAPL. Since AAPL now has the required pipe and the contractual obligations of Sacilor and AAPL are a nullity, there is no live case or controversy to be resolved by Sacilor's suit. *See Burke v. Barnes*, — U.S. —, 107 S.Ct. 734, 93 L.Ed.2d 732 (1987). Sacilor argues that the possibility of recovery of money damages against the Secretary in a suit in the Claims Court on a Fifth Amendment taking theory or in a district court under the Federal Tort Claims Act presents a sufficiently live controversy for this court to decide the present case. We do not agree. No such claims were presented to the trial court and this court will not render an advisory opinion on claims that were not or could not be raised below.

For these reasons, we vacate the trial court's judgment and remand for entry of judgment dismissing the cases for lack of jurisdiction.

Because of our decision on the standing and mootness issues, it is unnecessary to

address appellants' other arguments on the question, decided in the affirmative by the trial court, whether judicial review of the Secretary's determination was unavailable because it involved a foreign affairs function and was, therefore, committed to agency discretion by law. We note, however, that the analysis of a similar question by the Supreme Court in *Japan Whaling Association v. American Cetacean Society,* — U.S. —, 106 S.Ct. 2860, 2865–66, 92 L.Ed.2d 166 (1986), which was decided after the trial court decided this case, would apply.

VACATED AND REMANDED